[Civ. No. 17261.   Second Dist., Div. Three.   July 14, 1950.]

ROSEMARY OSBURN, Appellant, v. HOWARD W. WRIGHT, as Administrator With the Will Annexed, etc., Respondent.

*Assigned by Chairman of Judicial Council.

John C. Packard for Appellant.

Chandler, Wright, Tyler & Ward for Respondent.

SHINN, P. J.—This action involves the construction of the following agreement:

"September 24, 1945

"Robert A. Wallace,
 Los Angeles,
 California.

Dear Sir:

"Heretofore, when I purchased certain property at Santa Maria, California, there was included in the sale certain residium which was and is now located in the earthen pits on the property. My agreement with you, which was made by my

agent, D. P. Neill, was that you were to receive the sum of $25,000 out of the sale of one-half of the residuum. I have therefore paid you on account $12,500, which you acknowledged the receipt of. There is a balance due you of $12,500 out of one-half of the sales of the residium when and if made.

"I now agree to pay to your designated agent the sum of $12,500 out of one-half of the first sums realized from the sale of the residium, when and if made.

"In this agreement I am not to be limited in any way in making such sales.

"Please acknowledge this understanding by executing this letter in the place provided.

R.H. Hawn
R.H. Hawn

Accepted:

    Robert A. Wallace
    Robert A. Wallace."

In February, 1944, Hawn acquired title to certain real property with a quantity of residuum located thereon which had been accumulated in the refinement of petroleum. Hawn's grantor, Silver Wing Oil Company, had previously made a contract with Five C Refining Company for the sale of the residuum, to be paid for as extracted at the rate of 13 cents per barrel. In making his purchase Hawn took title subject to, and agreed in writing to be bound by, the agreement of sale to Five C. However, he repudiated the Five C contract, refused to perform under it, and undertook to sell the residuum to one Neill. In the litigation which followed between Neill and Five C, the latter's contract was confirmed by the court and after affirmance of the judgment on appeal on April 17, 1947 (*Neill* v. *Five C. Refining Co.*, 79 Cal.App.2d 191 [179 P.2d 818]), something over $18,000 that had been deposited in court by Five C was paid to Howard W. Wright, as administrator with the will annexed of the estate of R. H. Hawn, deceased, Neill having on September 18, 1945, assigned to Hawn any interest he might have in the fund.

The judgment which confirmed the Five C contract was rendered on the 12th of September, 1945. The above quoted agreement between Hawn and Wallace was entered into September 24, 1945. Plaintiff, as assignee of Wallace, brought suit on the agreement for $12,500 after her claim for that amount against the estate of Hawn had been rejected. She contends for a construction of the agreement under which

one-half of the sum on deposit in the case of *Neill* v. *Five C. Refining Co.* would be payable to her, to be applied on the $12,500 indebtedness. The defendant, administrator with the will annexed, contends that the $12,500 was to be paid from the proceeds of future sales, if any should be made, and no part of it from funds that were, or might become payable by Five C. The trial court agreed with this construction, gave judgment for the defendant, and plaintiff appeals. The facts of the case are considerably involved. A history of the events that led to the present suit will be found in *Neill* v. *Five C. Refining Co., supra.*

The agreement is unquestionably ambiguous, and would be somewhat difficult to interpret without a consideration of the surrounding circumstances and the relation of the parties at the time it was made. (Civ. Code, § 1647.) ▇ Hawn drew the agreement, and since he was the promisor, it should be interpreted in the sense in which he believed it to be understood by Wallace, the promisee. (Civ. Code, § 1649.) As we shall see, there was strong circumstantial evidence that the parties understood the agreement as the court understood it.

▇ In the trial of the present action there was introduced into evidence the entire superior court file in *Neill* v. *Five C. Refining Co.* Included in this file are voluminous pleadings and affidavits, all of which were for consideration by the trial court. They show quite clearly the claims that were being made by the various parties with respect to the ownership of the residuum at the time of the trial of that action. When Silver Wing sold the residuum to Hawn title was claimed by Maguire Oil & Refining Company. Wallace was president of Maguire. This company filed a complaint in intervention in *Neill* v. *Five C. Refining Co.* asserting its title. Although Hawn had agreed to be bound by the contract between Silver Wing and Five C, he answered in *Neill* v. *Five C.*, denying that Five C ever acquired a valid right to purchase the residuum from Silver Wing, and asserting that he had acquired the same from Maguire Oil & Refining Company. Further evidence of Hawn's intention to escape from the Five C contract is furnished by the fact that on June 1, 1944, he entered into an agreement to sell the residuum to D. P. Neill for a price of $100,000 to be paid as the material was removed. That contract reads, in part, as follows: ''The undersigned contends that Five C Refining Company, a corporation, has illegally and wrongfully gone upon the premises and removed portions

of said residuum, and converted the same to its own use, against the will and without the consent and in violation of the ownership of the undersigned.

"The undersigned, R. H. Hawn, has agreed to sell, and hereby does sell, all of his right, title and interest in and to said refinery, together with all equipment appurtenant thereto, and all of the residuum situate on the lands above described, to D. P. NEILL; including all of the right, title and interest of the undersigned in and to the residuum unlawfully and illegally removed by said Five C Refining Company, together with the right to recover the same, or the value thereof, in an action for conversion against said Five C Refining Company.

"Payment for said refinery and residuum shall be made in the following manner:

"The sum of thirty cents (30¢) per barrel for all residuum removed by D. P. Neill or his nominee from the above premises shall be payable immediately by said D. P. Neill, whenever and as often as any residuum shall be removed from said sumps.

"Any sums collected by D. P. Neill from Five C Refining Company shall be forthwith paid and delivered to R. H. Hawn to apply on the purchase price herein specified. In any event, within ninety (90) days after D. P. Neill shall have recovered a judgment in any action against Five C Refining Company, determining that Five C Refining Company has no right, title or interest in or to any part of the residuum hereinabove described, and said judgment shall become final, D. P. Neill shall pay the sum of $100,000 to the undersigned, R. H. Hawn, less any sums which have theretofore been paid under the provisions of this agreement. Any and all payments to be made by D. P. Neill to R. H. Hawn hereunder shall be paid to J. M. Jackson, Trustee, State National Bank of Houston, Houston, Texas, and shall be credited to the account of R. H. Hawn with the Continental Bank and Trust Company.

"By the acceptance hereof and his signature hereon, D. P. Neill agrees to purchase said residuum and make payment therefor, at the times and in the manner herein set forth."

Neill also declined to recognize the Five C contract, and when he refused to allow Five C to remove residuum, and undertook to remove it himself, the conflict of interest resulted in Neill's bringing the above mentioned action against Five C for damages, and for conversion, in which the conflicting claims of the parties were asserted, as we have related.

Although it is stated in plaintiff's brief that Hawn had previously paid $12,500 to Wallace from sums received from Five C, we find no evidence in the record to sustain that statement. There was evidence that Five C did not remove any of the residuum between October, 1943, and October, 1944, and no evidence that Five C ever paid Hawn any sums directly. The money that was deposited in court in *Neill* v. *Five C* represented sums accrued for residuum removed between October, 1944, and August, 1945, under an injunction which prevented Neill and Hawn from interfering with Five C's operations.

There was no evidence as to the negotiations between Hawn and Wallace at the time the quoted agreement was entered into. Neill was present at the negotiations and although his deposition was taken on behalf of the plaintiff he was not questioned concerning any conversations had between Hawn and Wallace before or at the time the agreement was entered into. Wallace was not called as a witness nor was his absence accounted for by plaintiff. It was to be presumed, under these circumstances, that the testimony of Neill and Wallace as to the discussions between Hawn and Wallace would not have been advantageous to plaintiff. (Code Civ. Proc., § 1963, subd. 5; *People* v. *Kelly*, 77 Cal.App.2d 23 [174 P.2d 342]; *Humiston* v. *Hook*, 86 Cal.App.2d 101 [194 P.2d 122]; *Morley* v. *Malouf*, 88 Cal.App.2d 680 [200 P.2d 159].)

As recited in the agreement, Hawn had promised to pay Wallace $25,000 from one-half the proceeds of sales of residuum. Wallace (as we mentioned) was president of Maguire Oil & Refining Company. Both this corporation and Hawn were disputing and continued to dispute the title of Silver Wing and Five C to the residuum. They claimed it had a value far exceeding 13 cents per barrel. Under the Hawn-Neill agreement the latter was to pay 30 cents per barrel and all the parties claimed the value to be even greater. Both Hawn and Neill made affidavits in the case of *Neill* v. *Five C* that they had entered into an agreement to sell a large quantity for $1.00 per barrel, and Maguire Oil & Refining Company, by its complaint in intervention, asserted it to be worth $1.25 per barrel. Although there are many other collateral facts that might be recited those we have stated are sufficient to show the important circumstances under which the Hawn-Wallace agreement was made.

We do not see how the trial court, in the light of all the evidence, could have construed the agreement as contended

for by plaintiff. Although the Hawn-Wallace agreement was made after the superior court had confirmed the Five C agreement it was no doubt contemplated by both Hawn and Wallace that an appeal would be taken, since the judgment was adverse to the claims of Hawn, Neill and Maguire Oil & Refining Company. All the circumstances indicate that from the time Hawn acquired the property he intended to escape from the Five C agreement and to sell the residuum for a much larger price than Five C had agreed to pay. Wallace, as president of Maguire Oil & Refining Company, was active in the efforts of his company to defeat the claims of Five C. He also filed an affidavit in *Neill* v. *Five C. Refining Co.* and was fully conversant with the contentions of Hawn and Neill with respect to the claimed unenforceability of the Five C agreement. The most significant feature of the Hawn-Wallace agreement is that although some $18,000 was on deposit with the clerk of the court at the time the agreement was made, it contains no provision for a division of that fund if the judgment should be affirmed on appeal. It would be difficult to believe this omission was the result of oversight. The further provisions that the $12,500, should be paid from one-half the receipts from sales "when and if made," and that Hawn was not to be restricted in making such sales, are in sharp conflict with the theory that Wallace was to receive one-half of any sums that might be received from Five C, whose rights were being contested by Hawn, Wallace and Neill. In our opinion the evidence all points toward the conclusion that Wallace understood it to be Hawn's purpose not only to reacquire the property from Neill, if, indeed, he had not already done so, but to apply on the $12,500 indebtedness only one-half of the sums received from future sales, if and when he should be in a position to make them. We can see no good reason for disturbing the interpretation placed upon the agreement by the trial court. It is supported not only by the terms of the writing, but also by the intentions of the parties which were reasonably to be inferred from the surrounding circumstances.

The judgment is affirmed.

Wood, J., and Vallée, J., concurred.

A petition for a rehearing was denied August 7, 1950, and appellant's petition for a hearing by the Supreme Court was denied September 11, 1950.